**In re SAINT PETER'S SCHOOL, Debtor.**

**Bankruptcy No. 81 B 20569, 81 Adv. 6149.**

United States Bankruptcy Court, S. D. New York.

Jan. 12, 1982.

---

Bleakley, Platt, Schmidt & Fritz, Bleakley Schmidt, P. C., Reich & Reich, White Plains, N. Y., for Saint Peter's School.

McCarthy, Fingar, Donovan, Glatthaar, Drazen & Smith, White Plains, N. Y., for Lincoln First Bank, N.A.

HOWARD SCHWARTZBERG, Bankruptcy Judge.

Saint Peter's gates closed in 1979. It had formerly conducted a school on approximately 80 acres in Westchester County,

New York, but its students were phased out when governmental financing ceased. After several moratoriums following its default under its first mortgage held by the plaintiff, Lincoln First Bank, N.A. ("the bank"), a judgment of foreclosure was entered in a state foreclosure action on August 11, 1981. The premises were scheduled to be sold on September 25, 1981. However, Saint Peter's filed its petition for relief under Chapter 11 of the Bankruptcy Code the day before the scheduled sale. The bank promptly sought relief from the automatic stay pursuant to Code § 362(d). After the trial, and on the eve of the adjourned date for the debtor to file its post-trial brief, the debtor changed attorneys with the result that a further delay ensued in order to afford the debtor's new counsel additional time to obtain familiarity with the case and to submit a post-trial brief.

## FINDINGS OF FACT

1. The debtor, Saint Peter's School filed its petition for relief under Chapter 11 of the Bankruptcy Code on September 24, 1981. It owns approximately 80 acres of land located partly in the City of Peekskill and partly in the Town of Cortland, New York. There are about 23 buildings located on the premises which were formerly used by the debtor when it operated as a private school for children under agreements with the Board of Education of the City of New York. The main portion of this property, consisting of about 62 acres in Peekskill, New York, are encumbered by a consolidated first mortgage held by the plaintiff bank. The remaining 18 acres not covered by the bank's mortgage are located adjacent to the 62 acres and lie totally within the Town of Cortland.

2. Saint Peter's discontinued its school activities in 1979 when funds ran out. The property is now vacant, except for a caretaker and his family. After Saint Peter's terminated its school it tried unsuccessfully to sell its facility which is its only financial asset. Saint Peter's asked the bank to forebear for a time in connection with the mortgage default in order to allow it some time to find a buyer. The bank agreed to a moratorium until February 1, 1980. Thereafter, the bank agreed to another extension of time until June 30, 1980, at which time the bank advised Saint Peter's that since there were no potential purchasers the bank would have to commence foreclosure.

3. A judgment of foreclosure in favor of the bank was entered in the state court on August 11, 1981. At the time the Chapter 11 petition was filed on the eve of the foreclosure sale the bank's secured claim totalled $694,172.48. In accordance with Code § 506(b), the bank is entitled to interest on its secured claim from the date of the filing of the Chapter 11 petition.

4. In addition to the bank's secured claim under the foreclosure judgment there are two mortgages held by Trinity Church in the principal sum of $50,000. Additionally, the Episcopal Mission Society holds fourth and fifth mortgages in the total principal amount of $256,000, together with accrued interest of $77,412, at the rate of 8.5% per annum. Both Trinity Church and the Episcopal Mission Society understandably oppose the bank's request for relief from the automatic stay. Although Saint Peter's enjoyed a tax exempt status from real property taxes when it operated as a school, the City of Peekskill removed the tax exempt status from its assessment rolls after Saint Peter's ceased its operations. The schedules filed by Saint Peter's list a disputed tax claim of the City of Peekskill in the amount of $57,939.52, which is prior in status to the bank's first mortgage. Unpaid contributions under the New York State Labor Law amount to $101,625.23. Two other secured claims have been filed in the total sum of $1759.10, under a judgment and a mechanic's lien. Thus, the total secured indebtedness, excluding the bank's claim, is $467,323.85.

5. Hence, as of the filing of the Chapter 11 petition, the total secured claims amount to $1,161,496.33, exclusive of interest from September 24, 1981. This includes the tax claim of $57,939.52, which Saint Peter's disputes on the theory that it is still tax exempt, notwithstanding the discontinuance

of its school. The bank observes that post-petition interest on all of the secured liens will raise the total secured claims to a figure in excess of $1,225,000.

6. The debtor's real estate expert valued the property encumbered by the bank's mortgage as $2,233,000, based on a multi-family use, as the highest and best use. He estimated 638 condominium units could be constructed on the premises. However, this figure is not consistent with existing zoning requirements and assumes, without proof, that there would be a demand for that many units.

7. The bank's real estate expert also testified that the highest and best use for the property in question would be the construction of 295 condominium units. His calculations took in existing zoning requirements and a reasonable demand for no more than 295 units. However, there was no proof that there existed a probable market in this area for even 295 units. Indeed, the bank's expert testified that the market in the Peekskill area could not presently absorb 295 condominium units. Nevertheless, he valued the property at $1,045,000. The bank's expert was credible and realistic as to what a willing buyer would be willing to pay for this property, based upon his knowledge as to comparable sales. Accordingly, the property is found to be worth $1,045,000, i.e., the 62 acres covered by the bank's lien.

8. The accuracy of the $1,045,000 valuation is supported by the existence of an actual willing buyer who was found by a real estate agent for the debtor and who originally offered on the eve of the bank's foreclosure, to pay $1,000,000 over a period of years. This potential buyer, known as the Korean Buddhist Won Kak La Inc., signed a contract for the purchase free of all existing liens. After the commencement of this adversary proceeding the purchase offer was orally increased to $1,100,000, with the total cash payable at closing raised from $50,000 to $350,000.

9. The Korean Buddhist Won Kak La Inc. deposited $250,000 in escrow with the debtor's counsel as an expression of its good faith desire to purchase the property in question. The purchase price is to be paid off by 1989, with interest at the rate of 9¾ per cent per annum.

10. Since the debtor's property was encumbered by liens in excess of $1,225,000, as of the filing of the Chapter 11 petition on September 24, 1981, and since interest of four months has accrued on the secured indebtedness, and since the City of Peekskill appropriately determined that real estate taxes will continue to accrue against the property that is no longer actually used for religious purposes, it follows that the Korean Buddhist Won Kak La Inc. written offer to purchase for $1,000,000, or its oral increase to $1,100,000, cannot effect an acquisition free and clear of liens well in excess of $1,225,000, especially when the planned payments are to extend over a period of seven years. Therefore, the proposed purchase will not support an effective liquidation that could qualify as a reorganization under Code § 1123(b)(4).

11. The bank has established that the debtor lacks any equity in the only asset that forms the basis for this estate. The secured indebtedness against the property in question of over $1,225,000 exceeds the ascertained value of $1,045,000.

12. There is no likelihood that there will be an effective reorganization so as to conclude that the property in question is necessary to such effective reorganization. After four months since the filing of the petition under Chapter 11 the debtor has yet to file a plan of reorganization. The debtor concedes that it filed the Chapter 11 petition at the outset for the sole purpose of liquidating its only asset, the vacant premises that formerly housed the now defunct school. After more than two years of attempting to find a purchaser the debtor was able to come up with a prospective purchaser on the eve of the Chapter 11 filing who submitted a written offer to purchase free and clear of all liens for $1,000,000 (orally raised to $1,100,000) which is illusory and cannot satisfy encumbrances in excess of $1,225,000. There are no other prospects in sight.

13. The bank is not adequately protected. The debtor has not offered the bank any additional protection against its steadily declining interest as the real estate taxes, which have priority status over the bank, continue to mount. Moreover, interest continues to accrue on the secured indebtedness in accordance with Code § 506(b). The debtor has no source of income to make any periodic payments to the bank. In light of the continuing erosion of the bank's interest, it would be inequitable to require the bank to suffer further impairment of its interest while the debtor continues to look for a prospective purchaser who can come up with enough funds to satisfy the bank's secured claim as well as allow the second, third, fourth and fifth mortgagees to realize something for their liens. Indeed, after more than two years of searching for a purchaser the debtor has not produced even one prospective purchaser who could come up with sufficient funds to allow the debtor to realize any return of equity beyond the encumbrances against the property. Thus, the only interests who would benefit from the delay while the debtor searches for a potential purchaser are the second, third, fourth and fifth mortgagees, namely Trinity Church and the Episcopal Mission Society. However, these interests are junior to the bank's interest. Moreover, a Chapter 11 reorganization should serve to benefit the debtor's interests and not exclusively those of junior lienors.

## DISCUSSION

Financial salvation for Saint Peter's lies not in the proposed liquidation of its real estate under a Chapter 11 plan of reorganization. After more than two years in default under its first mortgage with the bank, and with the cooperation and indulgence of the bank as to a foreclosure sale, Saint Peter's received an offer from an organization known as Korean Buddhist Won Kak La Inc. to purchase the property free and clear of all liens for a deferred payment aggregating $1,000,000 (orally increased to $1,100,000), which is less than the encumbrances, totalling in excess of $1,225,-000. Unless the first mortgagee bank is to

be paid off in full on confirmation (which has neither been proposed nor suggested), the bank is entitled to retain a lien on the property to the extent of the allowed amount of its claim. Code § 1129(b)(2)(A)(i). Therefore, an offer to acquire the property free and clear of the bank's lien, without providing the bank with the present value of its claim on confirmation, is illusory and does not contribute to an effective reorganization.

In seeking relief from the automatic stay under Code § 362(d), the first mortgagee bank has met its burden imposed under Code § 362(g)(1) of proving that the debtor lacks equity in the property in question within the meaning of Code § 362(d)(2)(A). The property is worth $1,045,000 and is encumbered by liens totalling in excess of $1,225,000. The debtor, on the other hand, has the burden of proof on all other issues. Code § 362(g)(2). Hence, in resisting relief from the automatic stay, the debtor must prove that the property is "necessary to an effective reorganization", as required under Code § 362(d)(2)(B), or that the first mortgagee bank is adequately protected, as set forth under Code § 362(d)(1). The grounds for relief under subsections (d)(1) and (d)(2) are stated in the alternative. Therefore a creditor who establishes a basis for relief from the automatic stay under subsection (d)(2) is not automatically entitled to relief if the debtor is able to prove that notwithstanding such proof, the creditor is nevertheless adequately protected under subsection (d)(1). See *In re Thomas Parker Enterprises, Inc.*, 8 B.R. 207 (Bkrtcy.B.C.Conn.1981).

An "effective" reorganization, as contemplated under Code § 362(d)(2)(B) requires more than an assertion that no reorganization is possible without the property, since all debtors who resist relief from the automatic stay obviously regard all their assets as indispensable for reorganization purposes. If all the debtor can offer in response to a request for relief from the automatic stay is the hope that sometime in the future some purchaser may appear on

the horizon with a sufficiently substantial offer to support a plan of reorganization, it cannot be concluded that an "effective" reorganization is likely. *In re Terra Mar Associates*, 3 B.R. 462 (Bkrtcy.B.C.Conn. 1980); *In re Hutton-Johnson Co. Inc.*, 6 B.R. 855 (Bkrtcy.B.C.S.D.N.Y.1980); *In re Riviera Inn of Wallingford, Inc.*, 7 B.R. 725 (Bkrtcy.B.C.Conn.1980); *In re Clark Technical Associates, Ltd.*, 9 B.R. 738 (Bkrtcy.B.C. Conn.1981). At this juncture, the debtor has not shown that an "effective" reorganization is likely. The only purchase offer under consideration is illusory, since it does not preserve the integrity of the first mortgagee bank's judgment lien, nor does it contemplate cash payments totalling the allowed amount of the bank's claim of a value, at confirmation, of at least the present value of its first mortgage, as required under Code § 1129(b)(2)(A)(i)(I) and (II).

It should be observed that a debtor may propose a plan for the sale subject to Code § 363(k), of property free and clear of liens, with such liens to attach to the proceeds provided that the proceeds equal the present value of the lienor's claim. Code § 1129(b)(2)(A)(ii). It cannot presently be found that after the consummation of such a sale free of all liens, the proceeds will satisfy the first mortgagee bank's secured claim. The expenses, commissions and fees in connection with the sale have not been established. Additionally, consideration must also be given to the administration expenses and fees in connection with the Chapter 11 case. These items will bear on the feasibility of realizing an "effective" reorganization, since the property in question is the sole asset in this case. In any event, a sale of this property for the contract price of $1,000,000, (or even for the orally raised amount of $1,100,000) would be less than the aggregate secured claims in excess of $1,225,000. It is questionable that this court is empowered in such case to authorize a sale for less than the aggregate of the secured claims since Code § 363(f)(3) requires that absent the consent of the affected secured claims, the price at which property is to be sold free of all liens must be greater than the aggregate value of the secured claims. See *3 Norton Bankruptcy Law and Practice*, § 63.26, page 45. Even if the junior secured creditors were appropriately authorized to consent to a sale free and clear of their liens, there is no evidence that such consent has been given.

Absent any other proposals, it cannot be said that there is a likelihood that the debtor will be able to achieve an "effective" reorganization.

ADEQUATE PROTECTION

■ Concededly, the bank's lien, arising out of its judgment of foreclosure, is impaired within the meaning of Code § 1124. Its legal, equitable and contractual rights to immediate realization upon a foreclosure sale have been altered without any correlative provision for the payment, on the effective date of a proposed plan, of cash equal to the allowed amount of the judgment lien, as required under Code § 1124(3)(A). The debtor cannot now propose to cure previous defaults under the mortgage and reinstate its maturity for continued payments in accordance with its terms because the debtor's rights under the mortgage were terminated pursuant to state law when the bank obtained a judgment of foreclosure prior to the filing of the Chapter 11 petition. See *In re Triangle Laboratories, Inc.*, 663 F.2d 463 (3 Cir. 1981). In such instance a debtor cannot cure or achieve a deceleration of a pre-petition mortgage that was reduced to judgment. See *In re Garner*, 13 B.R. 799, 801 (Bkrtcy.B.C.S.D.N.Y.1981); *In re Pearson*, 10 B.R. 189 (Bkrtcy.B.C.E.D.N.Y.1981); *In re La Paglia*, 8 B.R. 937 (Bkrtcy.B.C.E.D.N. Y.1981). Had the bank not obtained a judgment of foreclosure, deceleration would be permitted under Code § 1124(2). However, the existence of the judgment of foreclosure into which the mortgage was merged, cannot simply be ignored. The foreclosure judgment provides the bank with an additional right to immediate realization of its legal, equitable and contractual interests. A deceleration of the mortgage would "otherwise alter the legal, equi-

table, or contractual rights to which such claim or interest [the judgment of foreclosure] entitled the holder of such claim or interest" as proscribed under Code § 1124(2)(D).

■ Therefore, to the extent that the bank does not receive cash on confirmation for the allowed amount of its claim, its interests will be impaired, so that adequate protection will be required. It is not for the court to structure what will constitute adequate protection of the secured creditor's interests; the debtor must affirmatively propose protection of the secured interest. *In re Clark Technical Associates Ltd*, 9 B.R. 738 (Bkrtcy.B.C.Conn.1981); *In re Riviera Inn of Wallingford, Inc.*, 7 B.R. 725 (Bkrtcy.B.C.Conn.1980); *In re Hutton-Johnson Co., Inc.*, 6 B.R. 855 (Bkrtcy.B.C.S.D.N.Y.1980); *In re San Clemente Estates*, 5 B.R. 605 (Bkrtcy.B.C.S.D.Cal.1980).

The debtor's contract with the Korean Buddhist Won Kak La Inc. calls for a purchase price of $1,000,000 (subsequently orally raised to $1,100,000) to cover the sale of all of the debtor's 80 acres of land located partly in the City of Peekskill and partly in the Town of Cortland, New York. However, the bank's lien relates only to the 62 acres in the City of Peekskill, which the court found to be valued at $1,045,000. Therefore, the proposed purchase price includes approximately 18 acres in the Town of Cortland to which the bank's lien does not extend. In determining to what extent the bank may derive any comfort from the proposed offering price, a reduction of the $1,000,000 written offer (or $1,100,000 oral increase) must be made for that portion attributable to the 18 acres in Cortland not covered by the bank's lien. Further consideration must be given to the fact that the only offer on the table cannot possibly produce any financial realization for the debtor; the only interests who will benefit from a further delay to consummate this sale are the junior mortgagees. A liquidation of the debtor's only asset as proposed will not rehabilitate the debtor nor afford it an opportunity for a fresh start. Therefore, in weighing the factors in the context of adequate protection, the court must be mindful of the fact that this debtor has no economic interest to preserve after the proposed sale to the Korean Buddhist Won Kak La Inc.

■ The real issue for consideration is whether a foreclosure judgment creditor should be delayed for more than four months from exercising its right to consummate a foreclosure sale, and for an additional six months, as requested by the debtor, during which time the judgment creditor's interests will continue to erode, in order to allow the debtor to entertain an offer to purchase the debtor's only asset so as to afford junior mortgagees the outside possibility that they might receive some compensation for their interests. To state the question is to answer it. If the bank's senior judgment lien has not already been jeopardized, and may be realized in full, as the debtor believes, there would then be some beneficial room for the junior mortgagees. If the junior mortgagees desire to protect their interests, if any, they may bid in at the foreclosure sale. It would be a perversion of Congressional intent to delay a senior lienor from the exercise of its rights by continuing an automatic stay under Code § 362 for more than four months after the filing of the Chapter 11 petition in order to allow the debtor to propose a plan (which has not yet been filed) calling for a complete liquidation of all of the debtor's assets, free and clear of liens, so that junior mortgagees might possibly be able to realize a portion of their claims.

This is not a case where a debtor seeks the protection of the automatic stay under Code § 362 for the purpose of rehabilitating a business in which the property in question is needed. Nor is this a case where a debtor desires the continuance of the automatic stay in order to preserve a home that is the subject of a rehabilitative plan under Chapter 13. The debtor discontinued its business more than two years ago, during which time it has been unable to sell the property in satisfaction of the defaulted and foreclosed first mortgage and the junior second, third, fourth and fifth mortgages. Having had the benefit of the automatic stay for

four months, the debtor urges that it be permitted to remain under the umbrella of the stay for another six months without offering the senior secured judgment creditor. any additional protection or even the prospect of paying off the judgment in full in the event of a liquidation sale. The debtor simply proposes the possibility of a liquidation that might cure the default under a mortgage that no longer exists and thereafter deferred payments from the Korean Buddhist Won Kak La Inc., who would acquire the property free and clear of all liens, including the senior secured judgment lien now held by the bank. The Korean Buddhist organization would pay interest at the rate of 9¾% per annum. The sole beneficiaries of this proposal (although no such plan has been filed) would be the junior mortgagees. As this court stated in *In re Cartwright Land Associates*, 3 B.R. 277 at 280 (Bkrtcy.B.C.S.D.N.Y.1980):

> "This is small comfort, however, to an investor who is locked in to an investment controlled by someone who has no equity in the property and who proposes to repay the debt over a period of time at substantially less than the current interest rate."

The case of *In re Alison Corporation*, 9 B.R. 827 (Bkrtcy.B.C.S.D.Cal.1981) bears on the facts in this action. There, the only asset of the debtor was certain improved real property. There were no unsecured creditors and the mortgage indebtedness and other liens secured by the debtor's sole asset exceeded the value of the property. The court granted a motion to dismiss the proceeding on the ground that the case had not been filed in good faith because it was an imposition upon the jurisdiction of the court. In reaching this result the court stated: (pp. 829, 830)

> "Concededly, the within case was filed solely to obtain the benefit of the automatic stay and to stave off the foreclosing creditors while the Debtor attempts to market the property. This case represents no policy reason to impose the jurisdiction of this Court. There is no unsecured creditor body which should be able to enjoy part of the equity in the property upon distribution. There is no prospect of a fresh start being promoted, since the corporate Debtor has only this single asset. The only reason to continue the stay in effect and keep the case going is so that the principals of the Debtor, *at the creditors'* risk, can retrieve their investment and obtain the appreciation in value of the property. They propose to do this without footing the bill by servicing the debt against the property.

> This is not to say there is anything wrong or sinister about the profit or recoupment motive. However, the utilization of the bankruptcy system should not be the method by which to obtain a profit or recoup an investment where a corporate entity is interposed between the investor and the secured creditor body. The parties should instead be left to the free market and their contractual and state remedies.

> There is no rehabilitation of the Debtor contemplated nor are there unsecured creditors who will benefit from the equity of the property. Neither of the dual policies of the Bankruptcy Code would be fostered by maintaining this case in Court.

> This case should be dismissed since it is an imposition upon the jurisdiction of the Court.".

It must be concluded that the debtor has not sustained its burden of offering adequate protection for the bank's senior judgment lien so as to justify a continuance of the automatic stay in this proposed liquidation case filed under Chapter 11.

## CONCLUSIONS OF LAW

Saint Peter's does not have a prayer for accomplishing an "effective" reorganization unless there emerges on the scene a financial angel who can enable the debtor to provide adequate protection for the bank's secured claim. Since the purchase offer from the Buddhist Won Kak La Inc. is insufficient succor to satisfy this need, it follows that the bank is not adequately protected and is entitled to relief from the automatic stay.

1. The debtor has failed to prove that it has offered the bank adequate protection for its judgment lien, as required under Code § 362(d)(1).

2. The bank has established that the debtor lacks equity in the property in question within the meaning of Code § 362(d)(2)(A).

3. The debtor has not shown that the property in question is necessary to an effective reorganization as prescribed under Code § 362(d)(2)(B).

4. The bank is entitled to relief from the automatic stay imposed under Code § 362(a) so that it may consummate its foreclosure action.

SUBMIT ORDER on notice.